ZIEGLER, Appellant, vs. BARK and others, Respondents.

*March 25—April 19, 1904.*

*Guardian and ward: Incompetent person: Sufficiency of petition: Notice: Presence of incompetent in court: Guardian* ad litem: *Appeal: "Person aggrieved:" Jurisdiction: Validity of agreements.*

1. A petition for the appointment of a guardian for an incompetent person is not insufficient to give the county court jurisdiction to proceed in the matter merely because it fails to state the names of the persons who would be affected by such appointment, and fails to show with whom the alleged incompetent resides and who is in possession of her property.

2. Where notice of the time and place for hearing such petition was given to the alleged incompetent by personal service and to all other persons by publication, in compliance with the statute and the order of the court, it was not essential to the jurisdiction that personal service should have been ordered or made upon the son with whom she resided and who had control of her property, or upon her other children.

3. Where the alleged incompetent was personally present in court during the hearing, it is immaterial that the order for such hearing did not require that, if able to attend, she be produced before the court.

4. On the hearing of a petition for the appointment of a guardian for an alleged incompetent person, the county court appointed a guardian *ad litem* for her, and, she having been adjudged incompetent and a guardian appointed, the guardian *ad litem* appealed on her behalf to the circuit court. *Held,* that such appeal gave the circuit court jurisdiction.

5. A son of the alleged incompetent person who had possession of all her property under an assignment or transfer from her, was a person aggrieved by the order and judgment of the county court appointing the guardian, and hence was entitled to appeal therefrom.

6. Upon the appeal in such case the circuit court had no authority to adjudge the validity of the agreement between the alleged incompetent and her son, whereby her property was transferred to him and he agreed to provide for her support,—an action brought by her to set aside such agreement being then pending.

Appeal from a judgment of the circuit court for Grant county: George Clementson, Circuit Judge. *Reversed.*

This is an appeal from a judgment reversing the order and judgment of the county court appointing a guardian of the person and estate of *Eleanor Bark,* who was alleged to be mentally incompetent. It appears from the record and is undisputed that Alfred Bark, the husband of *Eleanor Bark,* died October 14, 1896, leaving, him surviving, his widow, *Eleanor,* and eleven children, all of whom were of age, and a farm of eighty acres of land adjoining the city of Lancaster, on which he resided at the time, and another farm of 320 acres in the country. The two farms were together valued .at $12,600, and he had personal property of the value of $2,834.88, consisting of stock, machinery, produce, and property on his home farm, and claims against some of his children. Five days after the death of Alfred, the widow and the eleven children, after full conference, deliberately entered into a written agreement (Exhibit A) under seal,

wherein and whereby it was mutually agreed, in effect, that
the real estate should be kept together and undivided during
the life of the widow; that the income therefrom should be
applied to the payment of debts and taxes, and making re-
pairs, and the expenses of administration, and the remainder
should be paid to the widow during her natural life, out of
which the widow was to maintain a home on the eighty acres
for herself and her daughter Effie so long as she remained
unmarried.  Provision was also made therein for Effie, who
was weak-minded, in case she survived her mother.  It was
further agreed therein that the son John H. should be ap-
pointed administrator of his father's estate, and as such, and
as agent for the widow and the other ten children, should re-
side with his mother on the homestead, and manage and run
the same and all the lands and business pertaining to the es-
tate, and should receive compensation for his services, includ-
ing all commissions as administrator—$20 per month—with
the privilege of having one horse of his own on the farm, to
be used as one of the farm team.  John H. was thereupon ap-
pointed such administrator.  He was unmarried, and acted
as such administrator and agent up to the time of his death,
March 25, 1901.  He had not closed up the estate of his father
when he died, but it appears from the subsequent settlement
thereof by the administrator *de bonis non* that the estate was
indebted to him when he died in the sum of $175.80.  John H.
left a will whereby his share of the estate passed to his sister
Jennie and his two brothers, Addison A. and *James J.*

Upon the death of John H. the widow was left alone on
the homestead, as her daughter Effie had previously been
sent to an asylum, and subsequently a conference was had by
the children and their mother, who was aged and infirm, as
to her care and maintenance and the estate.  The result
was a written contract, under seal, executed by the widow,
*Eleanor,* and the son *James J.,* in the presence of five of the
other children, who signed the same as witnesses April 10,

1901. That contract is designated as Exhibit B, and recites the substance of the former contract (Exhibit A) with John H., his action as administrator and agent in carrying out that contract, the necessity of a home for the widow, and an administrator *de bonis non* of Alfred's estate, and the settlement of the same; and it was therein agreed between *Eleanor* and *James J.* that the latter should assume the care and management of such real estate, collect all rents and income therefrom, and out of the same he should pay all taxes and repairs thereon, keep the real estate in good condition, provide a comfortable support in sickness and health for *Eleanor,* and pay the expenses of her burial and all debts; and *Eleanor* thereby sold, assigned, and transferred to *James J.* all of the live stock, farm produce, farm machinery, money, and household furniture and goods then in her possession; the proceeds of the sale of personal property to be used in payment of outstanding debts. As compensation for his services, it was therein agreed that *James J.* should retain as his own all of the income from said property after making the payments above mentioned. It was therein agreed that such contract should be binding upon the parties during the life of *Eleanor.*

At the time of the death of John H., *James J.* lived, with his wife and children, in Minnesota, but in pursuance of the agreement (Exhibit B) he moved with his family onto the homestead at Lancaster with his mother. A few weeks afterwards *Eleanor* began to be dissatisfied, and took counsel with other children and lawyers. October 24, 1901, *Eleanor* verified a written complaint in her own name against her son *James J.,* alleging, in effect, that her signature to the agreemen (Exhibit B) had been procured by undue influence, and at a time when she did not comprehend its contents, and that she had been ill-treated by *James J.* in the previous August and September. The summons and complaint in that action were served on *James J.* October 26, 1901. October 25,

1901, *Eleanor* filed a claim in her own name for $2,057.50 against the estate of her son John H.

October 31, 1901, the daughter *Mary B.,* of Nebraska, filed her petition in the county court for the appointment of David Schreiner as guardian of the person and estate of *Eleanor,* on the ground that she had personal estate of the probable value of $2,000, and rights in real estate with an annual income of $700, and that, by reason of extreme old age and mental and physical incapacity, she was mentally incompetent to have the charge and management of her property. Upon the same day the county court made an order for the hearing of such application, and for the personal service of a copy of the order, on *Eleanor,* and publication of the same. Such service and publication were duly made, as appears from proofs in the record. On the hearing, December 3, 1901, *W. J. Brennan* was appointed guardian *ad litem* for *Eleanor* by the county court; and thereupon, and after hearing the testimony and examining the facts, the county court found, as matter of fact, in effect, that *Eleanor* was mentally incompetent to have the charge and management of her property, and incapable of taking care of herself and managing her property, and that she asked for the appointment of such guardian; that her personal property exceeded $1,000; and that David Schreiner, of Lancaster, was a competent and suitable person to be so appointed as such guardian—and thereupon adjudged and decreed accordingly.

From that order and judgment *James J.* and the said guardian *ad litem,* in behalf of the said *Eleanor,* appealed to the circuit court. After hearing the testimony and arguments of counsel, that court found as matters of fact, in effect, the making of Exhibit B, April 10, 1901, and its provisions; that *James J.* immediately after the execution of that agreement went into the possession of all the property, real and personal, of said *Eleanor,* under that agreement, and had been in such possession ever since; that said agreement was

a valid and binding contract between the parties thereto; that *Eleanor* had no other property, real or personal, than such as she conveyed by that instrument; that at all times since the execution of that agreement, when *Eleanor* was at his home, *James J.* has comfortably provided for her in sickness and in health, and both he and the members of his family have treated her with kindness; that no reason exists why a guardian should be appointed over her property, and that no reason exists why a guardian should be appointed for the person of such *Eleanor;* that said *Eleanor* made no complaint of any ill treatment at the home of *James J.* by him or by the members of his family; that she stated in open court that she did not want to have a guardian appointed over her; that *Eleanor* was mentally competent to have the management of her person, and also mentally competent to have the management of her property. And as conclusions of law the circuit court found, in effect, that the order of the county court adjudging *Eleanor* mentally incompetent, and appointing David Schreiner as guardian of her person and estate, be reversed; that no guardian should be appointed over her; that the costs and disbursements of the proceeding should be paid by the petitioner, *Mary B. Ziegler;* that this case be remitted to the county court for further proceedings in accordance with the decision and order of the circuit court. From the judgment entered thereon accordingly, the petitioner, *Mary B. Ziegler,* brings this appeal.

For the appellant there was a brief signed by *Bushnell, Watkins & Moses,* and oral argument by *A. R. Bushnell.* They argued, among other things, that a guardian *ad litem* ought not to have been appointed by the county court. One proceeded against under the statute as an insane or incompetent person may defend and appear by attorney, until adjudged insane or incompetent. *Appeal of Royston,* 53 Wis. 612. If one may defend in person and by attorney, a guardian *ad litem* for such person is improper. To appoint a

guardian *ad litem* in this proceeding is to anticipate and determine beforehand the very subject matter of the inquiry involved.

For the respondents there was a brief by *Lowry & Carthew,* attorneys for respondent *Bark,* and *W. J. Brennan,* guardian *ad litem,* and oral argument by *Harry E. Carthew.* They contended, *inter alia,* that the petition for guardianship was not sufficient to give the court jurisdiction because it failed to set out the persons who would be affected by such appointment, and because it failed to show with whom the alleged incompetent resided and who was in possession of her property. Sec. 3976, Stats. 1898; Gary, Probate Law, § 787; *In re Bassett,* 68 Mich. 348, 36 N. W. 97; *In re Myers,* 73 Mich. 401, 41 N. W. 334; *Partello v. Holton,* 79 Mich. 372, 44 N. W. 619; *Munger v. Probate Judge,* 86 Mich. 363, 49 N. W. 47; *Appeal of Royston,* 53 Wis. 617. No jurisdiction was obtained, because the order failed to require personal service upon said persons. See cases cited above. The appearance of the alleged incompetent cannot give jurisdiction or waive any of her rights. *Appeal of Royston, supra; North v. Joslin,* 59 Mich. 624.

CASSODAY, C. J.   1. It is claimed by the respondents that the county court never obtained jurisdiction to appoint a guardian, for the reason that the petition therefor failed to state the names of the persons who would be affected by such appointment, and because it failed to show with whom the alleged incompetent resided, and who was in the possession of her property. The statute required the verified petition to be made by a relative or friend of the alleged incompetent, and to state the fact of such incompetency. Sec. 3976, Stats. 1898. Here it was made by a daughter of the alleged incompetent. The petition is quite general in its statement of facts, but seems to comply with the provisions of that section. *Appeal of Royston,* 53 Wis. 612, 617, 618, 11 N. W.

36. In that case it was said to be the better practice for the petition to state the name of the person with whom, if any one, the supposed incompetent is living; who are his relatives, if any; what his estate consists of, and who has charge of it—so that the county court may act with full knowledge of those interested in the welfare of the incompetent and his estate, and may cause notice to be given to them of the application, if it shall deem such notice necessary or proper. But in that case the court refrained from holding "that a petition which fails to contain these matters is not sufficient, under the statute, to give the court jurisdiction to proceed in the matter." Id. The only object of stating in the petition the facts said to have been omitted would be to inform the court of the names of such persons, so that by notification their presence could be secured at the hearing. Here it appears from the record that *James J.,* the son of *Eleanor,* and the person with whom she resided at the time, and who claimed to be in the lawful possession of all the property belonging to *Eleanor,* appeared in the county court at such hearing, and moved to dismiss the proceeding for want of jurisdiction. A more complete petition could not have secured a more full hearing.

It is also claimed by the respondents that no jurisdiction was obtained by the county court, because service was never made on the alleged incompetent as required by the order, and because the order failed to require personal service upon the person having control of her person and property, and her children, and because no such service was ever made, and because the order did not require that the alleged incompetent, if able, attend before the court at the hearing. The statute cited required the county court to "cause a notice to be given to the supposed insane or incompetent person of the time and place of hearing the case, not less than twenty days before the time so appointed, and shall also cause such person, if able to attend, to be produced before him on the hearing." Sec. 3976, Stats. 1898. Here it appears from the

record that, on the day the petition was so filed in the county court, that court did make an order fixing the time and place of the hearing, as so required by the statute; and it was therein further ordered that notice thereof be given to *Eleanor Bark* by personal service upon her of a copy of that order at least twenty days before such hearing, and to *all other* persons interested by publishing a notice of the order for three successive weeks prior to the day of the hearing in a newspaper therein designated. The proof in the record is that such personal service of such copy was made on *Eleanor* November 7, 1901, and on the same day *Eleanor* signed a written admission of such service. The affidavit of the printer of the newspaper so designated, in the record, shows that notice of such hearing was published in such newspaper for three weeks successively, commencing November 7, 1901. It moreover appears from the findings of the county court that *Eleanor Bark* was personally present in court during such hearing. The requirements of the statute seem to have been fully complied with, and we perceive no ground for holding that the county court was without jurisdiction.

2. Counsel for the appellant contends that the county court was without authority to appoint *W. J. Brennan* guardian *ad litem* for *Eleanor* December 3, 1901, and that the appeals from the order and judgment of the county court taken by him and *James J.* were together insufficient to give the circuit court jurisdiction. A rule of the county court provides that "infants, insane persons and other persons under disability, shall appear and prosecute and defend by their guardians *ad litem* who shall be some such attorney, or by their general guardians." County Court Rule III, sec. 1. If *Eleanor* was at the time under disability, as adjudged by the county court, then a guardian *ad litem* was properly appointed. As said by Mr. Justice TAYLOR in the case cited:

"We can see no reason why a man who is proceeded against as an insane or incompetent person, under the statute, is not the proper person to defend against the proceeding; and,

until he is finally adjudged to be insane or incompetent, he may appear by his attorney, as any other person." *Appeal of Royston,* 53 Wis. 612, 625, 11 N. W. 36, 41.

Here the notice of appeal given by such guardian *ad litem* recites his appointment, and "that said *Eleanor Bark* is aggrieved by the order and judgment made by the said county court in said matter, . . . and that she desires to appeal therefrom, and, being himself aggrieved at said order and judgment, hereby appeals therefrom to the circuit court for said county." We are constrained to hold that the appeal so taken was effectual to give the circuit court jurisdiction. Besides, there can be no question but what *James J.* was aggrieved by such order and judgment, because it gave to the guardian so appointed the right to contest the claim which *James J.* made to the property which he held by virtue of an assignment and transfer from his mother. Such being the fact, there seems to be no doubt of the right of *James J.* to appeal from such order and judgment to the circuit court, as he did. Sec. 4031, Stats. 1898.

3. This brings us to the merits of the controversy. The conclusions reached by the circuit court were manifestly based upon the findings that the agreement made by and between *Eleanor* and *James J.* April 10, 1901, was a valid and binding contract between the parties thereto; that by that instrument *Eleanor* had transferred and conveyed all of her property, real and personal, to *James J.,* who had taken and held possession thereof ever since. If that agreement is a valid and binding contract between the parties thereto, and such transfer and conveyance is conclusive as against *Eleanor,* then it is very obvious that she would have nothing left, except an agreement for support, which might not necessitate the appointment of a guardian of her estate so long as she was kindly treated and properly supported. But had the circuit court authority in this proceeding to prejudge the validity and binding effect of that contract, and the conclusiveness of such transfer and conveyance? We are forced

to the conclusion that that court had no such authority. On the contrary, some days before the petition was filed for the appointment of such guardian, *Eleanor* had commenced an action in her own name against *James J.* to have that agreement set aside on the ground that the same had been procured by undue influence. For aught that appears, that action is still pending and undetermined. The mental condition of *Eleanor* did not prevent her from commencing that action in her own name. *Menz v. Beebe,* 95 Wis. 383, 70 N. W. 468. The day before commencing that action, *Eleanor* filed a large claim against the estate of her son John H. That claim involved the inquiry whether the agreement made October 19, 1896, between *Eleanor* and her eleven children, including John H., had been performed. That agreement is referred to as the basis of the agreement of April 10, 1901. The question here is not whether such claims or those agreements, or either of them, are valid and binding upon the parties, but whether *Eleanor,* "by reason of extreme old age or other cause, is mentally incompetent to have the charge and management of her property" in the condition described, within the meaning of the statute. Sec. 3976, Stats. 1898. This section has recently been construed by this court, and repetition is unnecessary. *In re Streiff,* 119 Wis. 566, 97 N. W. 189; *Schramek v. Shepeck,* 120 Wis. 643, 98 N. W. 213. The claims and rights of action thus made by *Eleanor,* or in her behalf, may be without foundation; but we have no right to assume that they are unfounded, on this application for the appointment of a guardian. We must hold that the finding of the circuit court that *Eleanor* was mentally competent to have the management of her property is against the clear preponderance of the evidence.

*By the Court.*—The order and judgment of the circuit court is reversed, and the cause is remanded with direction to affirm the order and judgment of the county court.